William  and  Nancy  DEVLIN,  Mary
Campbell, William and Dottie Free,
Dave and Esther Miller, Appellants

v.

CITY OF PHILADELPHIA.

Commonwealth Court of Pennsylvania.

Argued June 6, 2002.
Decided Aug. 29, 2002.

Dennis M. Abrams, Bala Cynwyd, for appellants.

Jane Lovitch Istvan, Philadelphia, for appellee.

BEFORE: DOYLE, Senior Judge,[1] COLINS, President Judge, McGINLEY, Judge, SMITH–RIBNER, Judge, PELLEGRINI, Judge, KELLEY, Senior Judge, and LEADBETTER, Judge.

OPINION BY Senior Judge DOYLE.

William and Nancy Devlin, Mary Campbell, William and Dottie Free, and Dave and Esther Miller (Appellants), who are residents and property owners in the City of Philadelphia (City), appeal to this Court from two orders of the Philadelphia County Court of Common Pleas. The first order, entered June 22, 1999, granted the preliminary objections of the City to Counts I and II of Appellants' complaint for declaratory and injunctive relief, and the second order, entered October 5, 2000, granted the City's application for summary judgment on the remaining three counts of their complaint.

This is a case of first impression in this Commonwealth, and the facts are as follows. On May 19, 1998, former City Mayor Edward G. Rendell signed into law certain amendments to The Philadelphia Code (Code) that are the underlying basis of this litigation. The amendments were the subject of three ordinances, all of which were passed by City Council on May 7, 1998, and essentially provide for the status of "life partnership" between members of the same sex. Specifically, Bill No. 970750 amended Chapter 9–1100 of the Code, entitled the Fair Practices Ordinance, by,

---

1. This case was assigned prior to the date when President Judge Doyle and Judge Kelley assumed the status of senior judges on January 1, 2002.

*inter alia,* amending the definition of "Marital Status" to include "Life Partners," adding a definition of the term "Life Partner," and by disallowing discrimination in employment and places of public accommodations based on "marital status." Bill No. 970749 amended Chapter 19–1400 of the Code, entitled Realty Transfer Tax, by excluding from the tax the transfer of real estate between Life Partners and requiring the joint signing of an affidavit with regard to any such transfer. Bill No. 970745 amended the Retirement System Ordinance and the Municipal Retirement Benefit Plan 1987 Ordinance to permit retirement system City employees to name as beneficiaries any person designated by the employee pursuant to applicable terms and conditions.

On August 14, 1998, Appellants, as residents and taxpayers of the City of Philadelphia, filed a complaint for declaratory and injunctive relief, seeking a declaration that Bill Nos. 970750, 970749, and 970745 be declared null and void.[2] Appellants alleged in Count I of their complaint, *inter alia,* that the Commonwealth has preempted the field of regulating the status of marriage and the marriage relationship, and the City is without power to create a new marital status and to extend health and pension benefits to City employees' Life Partners; in Count II, Appellants alleged, *inter alia,* that these bills violate the clear public policy favoring marriage that has been established by the Commonwealth; in Count III, Appellants alleged, *inter alia,* that the City's extension of health and pension benefits to Life Partners of City employees is *ultra vires;* in Count IV, Appellants alleged, *inter alia,* that the City cannot exempt real estate

transfers between Life Partners from taxation, and, finally, Appellants alleged in Count V of their complaint that the City does not have the authority to prevent discrimination against its newly defined marital class of Life Partners.

The City filed preliminary objections to the complaint, and, on December 9, 1998, Common Pleas, by order of Judge Pamela Pryor Dembe, granted the preliminary objections as to Counts I and II of the complaint and overruled them as to Count III. Thereafter, on June 22, 1999, Judge Dembe vacated her earlier order and filed an amended order, sustaining the City's preliminary objections to Counts I and II of the complaint and overruling them as to all three of the remaining counts. On July 10, 2000, Appellants and the City filed cross motions for summary judgment, and, on October 5, 2000, Common Pleas, by order of Judge Matthew D. Carrafiello,[3] granted the City's motion as follows:

1. The extension of health benefits and other benefits to life partners by the City of Philadelphia pursuant to the Fair Practices [Ordinance] and other legislation is deemed to be a valid exercise of authority.

2. The anti-discriminatory provisions of the Fair Practices [Ordinance] is deemed legal with respect to public accommodations and in terms of imposing obligations upon the City of Philadelphia as a public employer.

3. The amendments to the transfer tax ordinance providing an exemption for life partners is found to be Constitutional and legal.

---

**2.** On July 10, 2000, certain plaintiffs were dismissed from the original action filed in Philadelphia County; those plaintiffs who were not dismissed from the action are Appellants here.

**3.** This order was docketed on October 10, 2000.

4. The registration provisions of the Fair Practices [Ordinance] are deemed to be legal.

The Plaintiffs lack standing and are ineligible to apply for declaratory relief for purposes of challenging the application of the Fair Practices Act to private employers and non-governmental entities.

*Devlin v. City of Philadelphia,* 48 Pa. D. & C.4th 86, 100, 2000 WL 33199272 (2000). Judge Carrafiello noted in his opinion accompanying this order that Appellants had withdrawn their objection to the amendments to the Retirement System Ordinance contained in Bill No. 970745. *Id.* at 87.

On November 3, 2000, Appellants filed a Notice of Appeal,[4] and they now raise several issues for this Court's review, *viz.,* 1) whether Common Pleas erred in deciding that the City has the authority to create and regulate a kind of domestic relationship known as a "Life Partnership," when doing so vests rights and responsibilities in and between two people who heretofore had no such rights and responsibilities; 2) whether Common Pleas erred in deciding that the City's creation of a "Life Partnership" as a new domestic relationship is not

violative of Commonwealth public policy; and 3) whether Common Pleas erred in deciding that the City can exempt real estate transfers between Life Partners from the local realty transfer tax. (Appellants' brief, Statement of Questions Involved, at 6).

■ Of course, our review of a Common Pleas' order sustaining preliminary objections and dismissing a complaint is limited to a determination of whether that Court abused its discretion or committed an error of law. *Logan v. Lillie,* 728 A.2d 995 (Pa.Cmwlth.1999). Our review of a Common Pleas' order granting summary judgment is likewise limited to a determination of whether Common Pleas abused its discretion or made an error of law. *Salerno v. LaBarr,* 159 Pa.Cmwlth. 99, 632 A.2d 1002 (1993), *petition for allowance of appeal denied,* 537 Pa. 655, 644 A.2d 740 (1994). And, because, in the matter *sub judice,* "[t]here is no genuine issue of material fact that needs to be resolved[,]" (Joint Stipulation of Fact, para. 12 at 2), we have only to determine on appeal whether the Common Pleas Court committed legal error in granting the City's preliminary objections to Counts I and II and its motion for summary judgment.[5]

---

4. Participating in this appeal as *amici curiae* in support of affirmance are: The American Civil Liberties Union of Pennsylvania, The Center for Lesbian and Gay Civil Rights, The Aids Law Project of Pennsylvania, The Coalition of Labor Union Women, Community Legal Services, Family Pride Coalition, The League of Gay and Lesbian Voters, The National Center for Lesbian Rights, The National Gay and Lesbian Task Force, Pennsylvania National Organization for Women, The Pennsylvania Alliance for Democracy, The Statewide Pennsylvania Rights Coalition, Women in Transition, The Women's Law Project, The American Federation of State, County, and Municipal Employees, District Council 47, The American Federation of State, County, and Municipal Employees, Local 2186, and

The American Federation of State, County and Municipal Employees, Local 2187.

5. We disagree with the City that Appellants cannot now raise the issue that the City has impermissibly legislated in an area of **statewide** concern because Appellants did not specifically appeal Judge Carrafiello's holding that they lack "standing to challenge the provisions of the life partner ordinance as such provisions pertain to private employment and non-public entities[,]" *Devlin,* 48 Pa. D. & C.4th at 90, and that there is no justiciable controversy under the Declaratory Judgments Act, 42 Pa.C.S. §§ 7531–7541, with regard to the applicability of the Fair Practices Ordinance's amendment to non-City employees. *Devlin,* 48 Pa. D. & C.4th at 91. Throughout this litigation, Appellants have argued, in

### A. *Ultra Vires, Preemption and Public Policy*

▩ We begin our analyses of the issues before us by setting forth certain of the salient provisions of Bill No. 970750, which, again, amends Chapter 9–1100 of the Code. Section 9–1102(r) of the Code has been amended to define **"Marital Status"** as: "The status of being single, married, separated, divorced, widowed **or a life partner."** (Emphasis added). Section 9–1102(p) defines "Life Partner" as: "A member of a Life Partnership that is verified pursuant to § 9–1106(2)" and Section 9–1106(2)(a) defines "Life Partnerships" as follows:

(a) Definition. For purposes of this Chapter, "Life Partnership" shall mean a long-term committed relationship between two unmarried individuals of the same gender who:

(i) are at least 18 years old **and competent to contract;**

(ii) **are not related to the other Life Partner by blood in any way which would prohibit marriage in the Commonwealth of Pennsylvania;**

(iii) **are the sole Life Partner of the other person;**

(iv) have not been a member of a different Life Partnership for the past twelve months (unless the prior Life Partnership ended as a result of the death of the other Life Partner);

(v) **agree to share the common necessities of life** *and to be responsible for each other's common welfare;*

(vi) **share at least one residence with the other Life Partner;** and

(vii) agree under penalty of law to notify the [Philadelphia] Commission [on Human Relations] of any change in the status of the Life Partnership.

(Emphasis added). Section 9–1106(2) further provides the following:

(b) Verification. No Life Partnership shall be recognized as such under this Chapter unless the members of the Life Partnership have verified the Life Partnership by: (i) **filing with the Commission a Verification Statement,** in the form and manner required by the Commission, which states, **on penalty of perjury,** that the Life Partnership meets all the provisions of § 9–1106(2)(a); and (ii) **filing with the Commission proof that the Life Partners have been interdependent for a[sic] least six months prior to the date the Verification Statement is filed,** such proof to include at least three of the following:

(.1) common ownership of real property or a common leasehold interest in property;

(.2) common ownership of a motor vehicle;

(.3) driver's licenses listing a common address;

---

their capacity as citizens and taxpayers of the City with standing to seek to enjoin the provision of various "Life Partner" benefits to City employees, that the State has preempted the field for the regulation of marriage, but the City has nonetheless attempted to make domestic relations laws on its own, acting beyond its authority in doing so. Therefore, we believe Appellants have preserved the issue of preemption and that the City is confusing matters by suggesting otherwise.

Moreover, we note that, with respect to the specific issue of Appellants' standing to challenge the Life Partnership ordinance as it affects private entities, this case fits within the exception articulated by the Supreme Court in *Sprague v. Casey,* 520 Pa. 38, 550 A.2d 184 (1988) and *Application of Biester,* 487 Pa. 438, 409 A.2d 848 (1979) that, even where the taxpayers' interest is not substantial, direct or immediate, standing may be granted where the legislation would otherwise not be challenged. Here, no private employer sought to challenge this legislation and the City has no reason to do so; therefore, Appellants come within this limited exception.

(.4) proof of joint bank accounts or credit accounts;

(.5) proof of designation as a beneficiary for life insurance or retirement benefits, or beneficiary designation under a partner's will;

(.6) assignment of a durable power of attorney or health care power of attorney.

(c) Termination. Either Life Partner may terminate the Life Partnership by filing **a sworn Termination Statement** with the Commission, in the form and manner required by the Commission, **stating that the Life Partnership is to be terminated.** The termination shall become effective sixty (60) days from the date the Termination Statement is filed, if it is signed by both Life Partners. If it is not signed by both Life Partners, the Termination Statement shall become effective sixty (60) days from the date proof is filed with the Commission that a copy of the Termination Statement was served, either personally or by certified or registered mail, on the other Life Partner.

(Emphasis added). Moreover, due to the amendment to the Fair Practices Ordinance, Section 9–1103 and Section 9–1105 now disallow discrimination in employment and in places of public accommodation, respectively, based upon "marital status," as well as on grounds of race, color, sex, sexual orientation, religion, national origin, ancestry and handicap.[6]

With respect to the initial issue raised by Appellants—whether Common Pleas erred in deciding that the City has the power to create and regulate Life Partnerships—we note that Appellants seem to be making two arguments. The first argument is that the City acted beyond its authority in creating Life Partnerships because neither the Pennsylvania Constitution nor its enabling home rule legislation gave the City the power to do so. The second argument is that the State has preempted the field of regulation of the marriage relationship and therefore the City may not enact a local ordinance creating a new or contrary marital status. In contemplating these issues, we first quote Article IX, Section 2 of the Pennsylvania Constitution: "A municipality which has a home rule charter may exercise any power or perform any function not denied by this Constitution, by its home rule charter or by the General Assembly at any time."

■ We also reiterate the following guiding principles of law:

Municipalities are not sovereigns; they have no original or fundamental power of legislation; they have the right and power to enact only those ordinances which are authorized by an act of the Legislature[.]

Moreover, an ordinance must be in conformity with the provisions of the enabling statutes; if it conflicts therewith it is void[.]

*Genkinger v. New Castle,* 368 Pa. 547, 549, 84 A.2d 303, 304 (1951) (citations omitted); *see also Ryan v. City of Philadelphia,* 77 Pa.Cmwlth. 283, 465 A.2d 1092 (1983).

Section 17 of the First Class City Home Rule Act (Home Rule Act),[7] 53 P.S. § 13131, makes clear that "[t]he City's legislative power is limited to its municipal functions." *Ryan,* 465 A.2d at 1093 n. 3.

---

**6.** We recognize, however, that, unlike Section 9–1103, relating to unlawful employment practices, Section 9–1105, relating to unlawful public accommodations practice, does not specifically provide for a prohibition based on age.

**7.** Act of April 21, 1949, P.L. 665, *as amended,* 53 P.S. §§ 13101–13157.

Section 17 provides in this regard as follows:

> Subject to the limitations hereinafter prescribed, the city ... shall have and may exercise all powers and authority of local self-government and shall have complete powers of legislation and administration in relation to its municipal functions....

53 P.S. § 13131.

Further, Section 18 of the Home Rule Act, 53 P.S. § 13133, provides the following:

> No city shall exercise any powers or authority beyond the city limits except such as are conferred by an act of the General Assembly.... Notwithstanding the grant of powers contained in this act, no city shall exercise powers contrary to, or in limitation or enlargement of, powers granted by acts of the General Assembly which are—
>
> ....
>
> (b) Applicable in every part of the Commonwealth.

As explained by our Supreme Court in *Ortiz v. Commonwealth*, 545 Pa. 279, 286, 681 A.2d 152, 156 (1996), "the General Assembly may negate ordinances enacted by home rule municipalities only when the General Assembly's conflicting statute concerns substantive matters of statewide concern...." Such substantive matters include "the health, safety, security and general welfare of all the inhabitants of the State, and not ... matters affecting merely the *personnel* and *administration* of the offices local to Philadelphia and which are of no concern to citizens elsewhere." *Lennox v. Clark*, 372 Pa. 355, 379, 93 A.2d 834, 845 (1953).

The salient question, then, is whether the City overstepped the bounds of its authority and legislated not merely as to its municipal functions but in a field of substantive statutory law of statewide significance and concern, and preempted by the state, when it amended the Fair Practices Ordinance to include the new category of "Life Partner" as a marital status.

Having reviewed the applicable portion of the Pennsylvania Constitution, the Domestic Relations Code,[8] and relevant case law instructive in this Commonwealth and elsewhere, we hold that the City did indeed act beyond the scope of its power **and** contrary to Sections 17 and 18 of the Home Rule Act when it defined and created for legal purposes a new relationship between same-sex persons that it categorized as being part and parcel of the marital state. Here, the City's creation of "Life Partnerships" constituted an exercise of power both contrary to and in enlargement of powers granted by acts of the General Assembly that are applicable throughout the Commonwealth. Further, it could not be clearer that, by enacting the Marriage Law, 23 Pa.C.S. §§ 1101–1905, as well as the Divorce Code, 23 Pa.C.S. §§ 3101–3904, and by providing uniform laws in domestic relations throughout the State, the General Assembly tacitly but thoroughly demonstrated its intent to preempt this field of legislation, which concerns the health, safety and general welfare of the State's inhabitants.[9] *See Western Pennsylvania Restaurant Association v. City of Pittsburgh*, 366 Pa. 374, 381, 77 A.2d 616, 620 (1951) (in which our Supreme Court stated that where the general tenor of a statute shows the General Assembly's intention that it should not

8. Act of December 19, 1990, P.L. 1240, 23 Pa.C.S. §§ 101–8415.

9. These laws were passed by the General Assembly on December 19, 1990, and became effective in 90 days.

be supplemented by municipal bodies, the local legislation should be held invalid).

Obviously, the City attempted to circumvent the Marriage Law when it specifically categorized the Life Partner relationship between a same-sex couple as a type of marital status. While the City would have us believe that "[t]he Ordinances do not impermissibly legislate in the field of the Domestic Relations Code or 'civil relationships' because they do not legislate with respect to relationships at all" (City's brief at 17), this reasoning is utterly facile.

■ Section 1102 of the Marriage Law, 23 Pa.C.S. § 1102, defines "Marriage" as "[a] **civil contract** by which **one man and one woman** take each other for husband and wife." (Emphasis added). The amendment to the Fair Practices Ordinance, Bill No. 970750, requires that, for a life partnership to be effective, the two same-sex persons seeking to solidify this relationship on paper, be "at least 18 years old and competent to **contract**[.]" Section 9 1106(2)(a)(i) (emphasis added). The amendment also requires that the same-gender couple not be blood-related in a way that would disallow **marriage** in this Commonwealth under Section 1304(e) of the Marriage Law, 23 Pa.C.S. § 1304(e) (regarding marriage to relatives). Further, the amendment requires that each member of the couple be the "**sole Life Partner** of the other person[,]" Section 9–1106(2)(a)(iii) (emphasis added), and that

they "**agree to share**" life's **common necessities** and **to be responsible for one another's "common welfare**[.]" Section 9 1106(2)(a)(v) (emphasis added). This language is redolent of that question beseeching a promise found in a standard marriage service, such as: "Do you **promise** to love [him or her], **comfort** [him or her], **honor and keep** [him or her], in **sickness and in health;** and, **forsaking all others,** to **be faithful** to [him or her] **as long as you both shall live?**"[10] A couple hoping to form a Life Partnership within the guidelines set by the City, just as a couple hoping to form a marriage within the laws set by the State, formally declares their intention to create the same mutual bond of loyalty, support, and obligation.[11] Just like a husband for a wife, or a wife for her husband, Life Partners are obligated to each other for their common welfare. For this reason, we reject any suggestion by the City that the Fair Practices Ordinance amendment does not create the Life Partner relationship, but merely "recognizes" it. After a Life Partnership is formed by a same-sex couple under the City of Philadelphia's ordinances, there is created a legal obligation "to be responsible for one another's common welfare" by reason of the marital status, and that mutual right of support would be capable of enforcement throughout the Commonwealth.

As well, we believe that the Verification Statement the City requires the same-gen-

---

10. THE BOOK OF COMMON PRAYER, The Blessing of a Civil Marriage, 433 (Church Hymnal Corp. 1979) (emphasis added).

11. We recognize that there is no requirement that a marriage be solemnized in any particular form before church or state officers, but it must be evinced by words said in the present tense, articulated with the purpose of forming a spousal relationship. *Commonwealth v. Jones,* 224 Pa.Super. 352, 307 A.2d 397, 398 (1973). This principle applies equally, of course, to common-law marriages. *See Id.;*

*see also Staudenmayer v. Staudenmayer,* 552 Pa. 253, 714 A.2d 1016 (1998). We note that, likewise, same-gender couples filing a Life Partnership Verification Statement in the City of Philadelphia use the present tense when they certify that they "**are** members of a 'Life Partnership' meeting each of the following requirements for the existence of a 'Life Partnership' set forth in Section 9–1106(2) of the Philadelphia Fair Practices Ordinance[.]" Life Partner Verification Statement at 1 (emphasis added).

der couple to sign and file is akin to a marriage license required under Section 1301 of the Marriage Law, 23 Pa.C.S. § 1301. Although the Verification Statement and marriage license do not require all of the same information, Section 1302(a) of the Marriage Law, 23 Pa.C.S. § 1302(a), provides that "[n]o marriage license shall be issued except upon written and **verified** application made by both of the parties intending to marry." (Emphasis added). Last, the amendment to the Fair Practices Ordinance provides that the Life Partnership may be terminated by the filing of a sworn statement with the Commission, Section 9–1106(2)(c), or by death. Section 9–1106(2)(a)(iv). If the Termination Statement is signed by both Life Partners, it takes effect sixty days from the date that it was filed; if it is signed by only one Life Partner, it takes effect sixty days from the date that that Life Partner files proof of service on the other Life Partner of a copy of the sworn Termination Statement. Similarly, a marriage can be terminated by filing an affidavit of mutual consent more expeditiously than if it is terminated on the allegations or proofs of only one party seeking a divorce. *See generally* Section 3301 of the Divorce Code, 23 Pa.C.S. § 3301. We believe that a sworn Termination Statement is meant to emulate, as closely as possible, a divorce decree.

Succinctly stated, we can think of no reason for this multitude of similarities other than a thinly veiled attempt by the City to duplicate the institution of marriage for couples of the same sex. For example, and perhaps most starkly, what other possible reason for prohibiting same-sex life partnership within the prohibited degrees of consanguinity for couples of the opposite sex under the Marriage Law if not to replicate the marital relationship? Clearly, "Life Partners," as defined by the City, cannot create their own biological child, and, therefore, the historic concern

that the closeness of certain blood ties is contraindicated for the creation of healthy children is inapplicable.

In further response to the City's assertion that it has not improperly legislated in the State-preempted field of domestic relations, but has only regulated an area of *municipal* interest by the passage of the amendment to the Fair Practices Ordinance, we point out that Section 9 1102(a)(vi) requires the same-gender couple to "share at least one residence with the other Life Partner[,]" **but does not require that that residence be within the City of Philadelphia. The accuracy of this statement is evidenced by the fact that forty persons who registered as "Life Partners" live outside the City.** (Joint Stipulation of Fact, para. 8 at 2). Therefore, it can easily be envisioned that Life Partners could reside in any of the surrounding four counties (Bucks, Chester, Delaware or Montgomery), or in another state (*e.g.*, New Jersey or Delaware), and one partner could undertake a daily commute to and from the City for work, or, in theory, they might share one residence anywhere in the state (a vacation home in the Poconos perhaps), with one partner commuting from an apartment in the City to and from work until the start of the weekend. By permitting couples to register in the City as "Life Partners," but, by not requiring them to live in the City, the regulations at issue, which create a new marital status, already extend beyond the City's borders.

This case is clearly different from one in which "the Home Rule Charter supersedes State statutes on matters of local concern." *Ebald v. Philadelphia*, 7 Pa. D. & C.2d 179, 182 (1957), *aff'd*, 387 Pa. 407, 128 A.2d 352 (1957) (wherein the Supreme Court, affirming on the trial court opinion, held that disability compensation for City police and firemen was indeed not a matter of

statewide concern). As former Supreme Court Justice Benjamin Cardozo, then sitting as a judge on the Court of Appeals of New York, stated many years ago in *Adler v. Deegan*, 251 N.Y. 467, 167 N.E. 705, 713 (1929), *amended on other grounds*, 252 N.Y. 615, 170 N.E. 164 (1930) (Cardozo, J., concurring):

> There are some affairs intimately connected with the exercise by the city of its corporate functions, which are city affairs only. Illustrations of these I have given, the laying out of parks, the building of recreation piers, the institution of public concerts. Many more could be enumerated. Most important of all, perhaps is the control of the locality over payments from the local purse. **There are other affairs exclusively those of the state, such as the law of domestic relations,** of wills, of inheritance, of contracts, of crimes not essentially local ..., the organization of courts, the procedure therein. **None of these things can be said to touch the affairs that a city is organized to regulate, whether we have reference to history or to tradition or to the existing forms of charters.**

(Emphasis added) (citation omitted).

Moreover, we find the case of *Arlington County v. White*, 259 Va. 708, 528 S.E.2d 706 (2000), instructive. There, the Supreme Court of Virginia decided that Arlington County acted *ultra vires* when it expanded the definition of eligible "dependents" under its self-funded health plan to include domestic partners, since doing so was an unreasonable method of fulfilling its implied authority under certain state statutes to provide self-funded health programs for employees and their dependents. In a dissent written as a result of the majority's failure to reach the issue of whether the County had the legal authority to recognize common-law marriages or

same-gender unions by bestowing health insurance benefits on domestic partners of County employees, Justice Leroy Rountree Hassell, Sr. explained:

> [T]he County's expanded definition of dependents is inappropriate because it permits the County to legislate in the area of domestic relations, a prerogative that lies within the exclusive domain of the General Assembly of this Commonwealth. The General Assembly, not a county, is entrusted with the responsibility of recognizing and defining marital relationships.
>
> . . .
>
> Even a cursory review of Arlington County's eligibility criteria demonstrates that Arlington County seeks to recognize such relationships because the criteria require that the employee, who seeks to add a non-employee as a dependent in the County's health plan, certify that the employee has resided with his or her domestic partner for a period of one year, "not [be] married to anyone," "[share] with the employee the common necessities of life and basic living expenses," "[be] financially interdependent with the employee," "not [be] related by blood to the employee," and "[be] involved with the employee in a mutually exclusive relationship of support and commitment." **There can be no question or doubt that Arlington County seeks to recognize, tacitly, relationships that are violative of the public policy of this Commonwealth.**

*Id.* at 713 (Hassell, J., dissenting in part and concurring in result) (emphasis added) (citations omitted).

As well, in *City of Atlanta v. McKinney*, 265 Ga. 161, 454 S.E.2d 517, 521 (1995), the Supreme Court of Georgia decided, *inter alia*, that the City of Atlanta "exceeded its power to provide benefits to employees and their dependents by recognizing do-

mestic partners 'as a family relationship' and providing employee benefits to them 'in a comparable manner ... as for a spouse.'" Although, later, this same Supreme Court upheld the validity of the revamped benefits ordinance defining a dependent as "one who relies on another for financial support," *City of Atlanta v. Morgan*, 268 Ga. 586, 492 S.E.2d 193, 195 (1997), and also requiring that a dependent be a domestic partner for purposes of receiving insurance benefits, the Court explained that "the City followed our holding in *McKinney* and carefully avoided the constitutional flaw in its previous benefits ordinance by eliminating from [this ordinance's] definition of 'dependent' any language recognizing any new family relationship similar to marriage." *Id.* at 195.

Although the City relies on case law from a variety of jurisdictions that have not invalidated certain domestic partnership legislation as unconstitutional, *see*, *e.g.*, *Lowe v. Broward County*, 766 So.2d 1199 (Fla.Dist.Ct.App.2000); *Schaefer v.*

*City & County of Denver*, 973 P.2d 717 (Col.Ct.App.1998); *Crawford v. City of Chicago*, 304 Ill.App.3d 818, 237 Ill.Dec. 668, 710 N.E.2d 91 (1999); *Slattery v. City of New York*, 179 Misc.2d 740, 686 N.Y.S.2d 683 (N.Y.Sup.Ct.), *aff'd as modified*, 266 A.D.2d 24, 697 N.Y.S.2d 603 (N.Y.App.Div.1999), we are unpersuaded.[12] In the matter *sub judice*, we hold that the City clearly was without authority to legislate in the field of domestic relations by defining and creating a new marital status, and Common Pleas erred in deciding otherwise. We further hold that the General Assembly has, by the enactment of the Domestic Relations Code and other related statutes, and, specifically, by Part II of the Domestic Relations Code, (*i.e.*, the Marriage Law), preempted the field of the marital relationship between two people in Pennsylvania. Again, **the General Assembly has precisely defined marriage as: "A civil contract by which one man and one woman take each other for hus-**

**12.** In *Lowe*, 766 So.2d at 1205, while stating that "[t]he law of domestic relations is one matter reserved for the state alone," the Court of Appeal of Florida, Fourth District, held that a county ordinance "does not legislate within that domestic relations zone that is reserved for the state," *id.*, but struck down as unconstitutional a provision of the ordinance that accorded a domestic partner of a patient the same rights as a spouse or family member regarding health care decisions. In *Schaefer*, a City of Denver ordinance that granted health and dental insurance benefits to the "spousal equivalent" *of a City employee* was held not to be unconstitutional. Denver is a home rule city. The Court of Appeals of Colorado, Division Four, held that "[t]he ordinance qualifies a separate and distinct group of people who are not eligible to contract a state-sanctioned marriage to receive health and dental insurance benefits from the City." *Schaefer*, 973 P.2d at 721. In *Crawford*, a City of Chicago ordinance allowing a "qualified domestic partner" *of a City employee* to participate in health, dental, and vision care insurance coverage and to participate in long-

term disability insurance was held not to violate Illinois statutes regarding marriage or "marital status." The Appellate Court of Illinois, First District, Fifth Division, determined that there was no statutory provision "which expressly preempts the City's authority to legislate in the area of its own employee benefits...." *Crawford*, 237 Ill.Dec. 668, 710 N.E.2d at 98. In *Slattery*, the Supreme Court of New York, New York County, distinguishing cases from other jurisdictions where the local ordinance and state law were in direct contradiction (*e.g.*, *City of Atlanta v. McKinney*), followed the view of the Colorado Court in *Schaefer* in finding that there was no conflict between the New York statutes and the City ordinance granting health and insurance benefits under its home rule charter *to its employees* and their domestic partners.

From these cases, we perceive a distinction between benefits provided to dependents of municipal employees based upon that dependency, and benefits provided by a municipal ordinance to same-sex partners based solely upon the "marital" relationship between those partners.

band and wife." 23 Pa.C.S. § 1102. This, of course, is directly contrary to the newly amended definition of the term "marital status" [13] found in the Philadelphia Code, which now may include a "Life Partner."

We find support for this conclusion from the opinion of our sister appellate Court where the issue presented was whether two persons of the same sex could contract a common-law marriage. The issue was raised when one of the partners to the relationship filed a complaint in divorce wherein he alleged that he and his partner were married in a common-law ceremony before friends and had lived together for approximately ten years. The complainant requested a divorce, the equitable distribution of property, alimony, alimony *pendente lite*, and costs. The Superior Court, affirming Common Pleas, held that it was impossible as a matter of law for two persons of the same sex to be "married," whether by statutory license and decree or by common-law:

> For we have no doubt that under our Marriage Law it is impossible for two persons of the same sex to obtain a marriage license. If, under the guise of expanding the common law, we were to create a form of marriage forbidden by statute, we should abuse our judicial power: our decision would have no support in precedent, and its practical effect would be to amend the Marriage Law— **something only the Legislature can do.**

*De Santo v. Barnsley,* 328 Pa.Super. 181, 476 A.2d 952, 955–956 (1984) (citation omitted) (emphasis added).

The City argues in its brief that, by including Life Partners under the category of "marital status," the City does not create a new category of marital relationship, but only "intended to list the categories of persons protected under its antidiscrimination ordinance." (City's brief at 24). However, if the previous antidiscrimination ordinance already prohibited discrimination based on "race, color, sex **[and] sexual orientation . . .**", the inescapable conclusion is that the category of Life Partners **is** a different category of marital status, not merely a category of sexual orientation.[14]

Furthermore, the City's argument that the ordinances do not violate public policy because they do not create a domestic relationship is rejected for the reasons already stated: that the category and status of "Life Partnership" **creates** a new, and unique, domestic relationship and, therefore, clearly violates public policy, **which public policy has been clearly and forcefully articulated by the Legislature of this Commonwealth.** On October 16, 1996, then Governor Tom Ridge signed into law Act 124 of 1996, which legislation passed by both Houses of the General Assembly by overwhelming majorities.[15]

Act 124 was, *inter alia,* an amendment to the Marriage Law and provides as follows:

**§ 1704. Marriage between persons of the same sex**

---

**13.** The term "marital" is defined as "1: of or relating to marriage or the married state <vows> 2: of or relating to a husband and his role in marriage[.]" WEBSTER'S NEW COLLEGIATE DICTIONARY 697 (1981).

**14.** This reasoning relates to Count V of Appellants' complaint.

**15.** On June 28, 1996, the amendment was adopted in the House of Representatives by a vote of 177–16, and, on October 1, 1996, the Senate concurred in the House Amendment by a vote of 43–5. (Legis.J.-House at 2024–2025; Legis.J.-Senate at 2454).

**It is hereby declared to be the strong and longstanding public policy of this Commonwealth that marriage shall be between one man and one woman. A marriage between persons of the same sex which was entered into in another state or foreign jurisdiction, even if valid where entered into, shall be void in this Commonwealth.**[16]

23 Pa.C.S. § 1704 (emphasis added) (footnote added). Nothing could be more clear, therefore, than that the City of Philadelphia's category of a marital relationship does indeed violate the abundantly clear public policy of this state.

### B. *Realty Transfer Tax* [17]

▬▬▬ Last, we consider whether Common Pleas erred in deciding that the City can exempt real estate transfers between Life Partners from the local realty transfer tax.[18] Article VIII, Section 1 of the Pennsylvania Constitution provides: "All taxes shall be uniform, upon the same class of subjects, within the territorial limits of the authority levying the tax, and shall be levied and collected under the general laws." Although the taxing scheme does not require absolute equality, *Mandl v. Commonwealth,* 161 Pa.Cmwlth. 481, 637 A.2d 703 (1994), *aff'd,* 539 Pa. 277, 652 A.2d 297 (1995), and a state may create different tax classifications, uniformity is required to be maintained within each class. *Commonwealth v. After Six, Inc.,* 489 Pa. 69, 413 A.2d 1017 (1980). Of course, "[t]he test of uniformity is whether there is a reasonable distinction and difference between the classes of taxpayers sufficient to justify different tax treatment." *F.J. Busse Co. v. City of Pittsburgh,* 443 Pa. 349, 358, 279 A.2d 14, 19 (1971). When considering a classification for taxation purposes, thought may be given to well grounded public policy concerns. *Equitable Life Assurance Society v. Murphy,* 153 Pa.Cmwlth. 338, 621 A.2d 1078, 1087 (1993).

Even though, here, Common Pleas held that there was a rational basis for exempting transfers between Life Partners, public policy long established in this Common-

---

**16.** The federal Defense of Marriage Act, 28 U.S.C. § 1738C, adopted by Congress on September 21, 1996, provides:

§ 1738C. Certain acts, records and proceedings and the effect thereof.

No State ... shall be required to give effect to any public act, record, or judicial proceeding of any other State ... respecting a relationship between persons of the same sex that is treated as a marriage under the laws of such other State ... or a right or claim arising from such relationship....

Furthermore, Congress itself has adopted a definition of the term "marriage" essentially identical to the definition that has been adopted by the General Assembly of Pennsylvania. Specifically, 1 U.S.C. § 7 provides:

§ 7. Definition of "marriage" and "spouse"

In determining the meaning of any Act of Congress, or of any ruling, regulation, or interpretation of the various administrative bureaus and agencies of the United States, the word "marriage" means only a legal union between one man and one woman as husband and wife, and the word "spouse" refers only to a person of the opposite sex who is a husband or a wife.

**17.** We note, again, that Appellants withdrew their challenge to Bill No. 970745, which amended the Retirement System Ordinance and the Municipal Retirement Benefit Plan 1987 Ordinance.

**18.** We note that the City imposes its local realty transfer tax pursuant to Section 1 of what is commonly referred to as the Sterling Act, Act of August 5, 1932, Ex.Sess., P.L. 45, *as amended,* 53 P.S. § 15971. Although the City is a home-rule municipality, this fact does not expand upon its taxing powers. 53 P.S. § 13133(a)(8). *See* SUMMARY OF PENNSYLVANIA JURISPRUDENCE 2D § 20:1 (1998).

wealth leads us to disagree. Bill No. 970749 currently excludes from local realty transfer tax transfers between a husband and wife, between a divorced couple who acquired the property or interest prior to their divorce, between parent and child or the child's spouse, between a grandparent and grandchild or the grandchild's spouse, and between Life Partners. We do not believe that inclusion of two unmarried, unrelated people who live together as Life Partners supports uniformity within the class. Further, it is clear that treating same-gender persons who have filed Life Partner Verification Statements differently from same-gender persons who have not filed such sworn statements promotes a lack of uniformity in the taxation arena.

Because the City's action in creating and regulating Life Partnerships as a marital status and new type of domestic relationship was *ultra vires,* we reverse in part and affirm in part the Orders of the Common Pleas Court.[19]

### ORDER

**AND NOW,** this 29th day of August, 2002, the order of the Court of Common Pleas of Philadelphia County, August Term 1998, No. 1631, dated June 22, 1999, is reversed to the extent that it sustained the City of Philadelphia's preliminary objections to Counts I and II of Appellants' complaint. The order is affirmed in all other respects.

Further, the Order of the Court of Common Pleas of Philadelphia County, August Term 1998, No. 1631, dated October 5, 2000, is hereby reversed, and summary judgment is granted on behalf of Appellants.

COLINS, President Judge, filed concurring opinion, in which KELLEY, Senior Judge, joined

### CONCURRING OPINION BY President Judge COLINS.

I concur in the majority's ultimate conclusion, but I cannot join in much of that opinion's discussion. Clearly, the City of Philadelphia, like private employers, can extend health and pension benefits to its employees' partners, but the ordinances in question, as written, confer greater rights on same-sex partners than on unmarried heterosexual couples: the right to pension and health benefits and excluding transfers between from life partners from local realty transfer tax. Ordinance No. 970750, as written, represents an attempt by the City to establish a civil marriage between same-sex partners, when the authority to do so, under the laws of this Commonwealth, is reserved to the General Assembly.

Senior Judge KELLEY joins in the Concurring Opinion.

---

**19.** The majority does not necessarily disagree with the discussion and opinions expressed in the concurring opinion, but point out simply that the issue raised therein, *i.e.,* the disparate treatment between unmarried heterosexual couples and unmarried life partners, was neither raised as an issue nor argued to this Court by the Appellants in this case.