## Commonwealth ex rel., Appellant, v. A. Overholt & Co., Inc.

## Commonwealth ex rel., Appellant, v. Joseph S. Finch and Company.

Argued May 9, 1938. Before KEPHART, C. J., SCHAFFER, MAXEY, DREW, STERN and BARNES, JJ.

*Guy K. Bard,* Attorney General, with him *William H. Wood,* Special Deputy Attorney General, for appellant.

*Charles H. Tuttle,* with him *Paris S. Russell, Hiram Thomas, Ernest Brooks, Jr., John G. Frazer, Arthur H. Hull,* of *Snyder, Hull, Hull & Leiby, Breed, Abbott & Morgan* and *Reed, Smith, Shaw & McClay,* for appellee in Nos. 31 and 32.

*John W. Davis,* with him *Maurice Bower Saul,* of *Saul, Ewing, Remick & Saul* and *Arthur Hull,* of *Snyder, Hull, Hull & Leiby,* for appellee in No. 33.

OPINION BY MR. JUSTICE MAXEY, June 30, 1938:

The question for decision is the constitutionality of the State Floor Tax on alcoholic liquors (Act of November 22, 1933, Special Session, P. L. 5, and the Amendment thereof of December 22, 1933, Special Session, P. L. 94). Section 3 of the Act provides: "A State floor tax is hereby imposed upon spirituous and vinous liquors lodged or stored in this Commonwealth at any time between the date this act becomes effective and the date the Twenty-first Amendment to the Constitution of the

United States is ratified by conventions in at least three-fourths of the several states, inclusive. Such tax shall be at the rate of two dollars on each proof gallon. . . ." The act requires payment ninety days after the taxes are due, and provides that the tax, with interest, shall be a lien upon such liquors from the date the tax is imposed until paid. Section 5 provides in part: "The tax . . . shall be paid into the State Treasury by the owner . . . and he shall be liable to the Commonwealth as a taxpayer for the payment of such tax." The Fiscal Code (72 PS sec. 1401) makes a state tax against any corporation a first lien upon the franchises and real and personal property of such corporation. The same Code (72 PS 1406-b) authorizes the Department of Revenue to bring suits for taxes, pursuant to which these were brought against the taxpayers, under Section 5. Heavy penalties were also provided for violation of the provisions of the act. An amendment authorized the Revenue Department to grant an extension of time for payment of the tax to not later than December 31, 1934.

The Commonwealth brought three suits in assumpsit for collection of this tax. The respective defendants were (1) A. Overholt and Co., Inc., hereinafter referred to as Overholt, (2) A. Overholt and Co., Inc., successor to Large Distilling Company, hereinafter referred to as Large, and (3) Joseph S. Finch and Company, hereinafter referred to as Finch.

The cases were tried together before President Judge HARGEST of Dauphin County and a jury. Verdicts were directed for plaintiff by the court against the defendants for the following amounts, respectively:

| | |
|---|---|
| Overholt | $1,704,347.96 |
| Large | 224,646.55 |
| Finch | 7,188,891.69 |

Various questions duly raised by the defendants were reserved for argument upon the motions for judgments n. o. v. and for a new trial. After argument before the

court in banc, defendants' motions for judgments n. o. v. were granted, the court having found the tax violative of (1) the provision in section 1 of Article IX of the State Constitution requiring uniformity in taxes upon the same class of subjects, and (2) the provision in section 1 of the Fourteenth Amendment to the United States Constitution prohibiting any State from depriving "any person of life, liberty, or property, without due process of law" or denying "to any person within its jurisdiction the equal protection of the law."

The "spirituous and vinous liquors" subject to the tax are defined as follows: "Distilled spirits, rectified spirits and wines, as defined in this Section, and alcohol, other than denatured alcohol unfit for beverage purposes." The following is the statutory definition of "distilled spirits": "Any liquid useable for beverage purposes which contains more than one-half of one per cent of alcohol by volume, obtained by distillation or any process of evaporation . . . including brandy, rum, whiskey, gin, and any other alcoholic beverage."

The quantities of spirituous and vinous liquors subject to the Floor Tax are set forth in Judge HARGEST'S able and comprehensive opinion, as follows: "At the effective date of the act [November 22, 1933], Overholt had in its possession 2,240,764.91 regauged gallons of whiskey of which it had purchased 1,430,990.12 gallons in June, 1933, and the dates of distillation ranged from the spring of 1930 to the fall of 1933. The market value, as of the date of the passage of the act, ranged from $9 per gallon for the 1930 whiskey, to $2 per gallon for the distillation of the fall of 1933. The total market value of this whiskey was $9,365,494.76. The floor tax was $4,481,529.82, ranging from 22% to 100% of its value. Of the total gallonage more than 800,000 gallons was of whiskey distilled in the fall of 1933, stipulated as worth $2 per gallon, making a total market value of $1,619,549.58, upon which the floor tax was 100% of the value. Overholt also had in its warehouse 5,816.20

gallons owned by others valued at $16 per gallon, on which the tax amounted to only 12½% of its value. It also had 30,171.63 gallons as bailee valued at from $15 to $16, of which the tax was 12½% to 13⅓% of its value. The Large Company owned 79,089.22 gallons, all at the stipulated market value of $2, against which the floor tax of $158,178.44 equals the total market value. It also had 2,082.65 gallons of pre-prohibition whiskey as bailee and 185,353.50 gallons in cases distilled in 1921 and prior thereto on which the tax amounted from 12½% to 13⅓% of the market value. At the effective date of the act the Finch Company had 4,077,920.12 gallons (of which 75,116 gallons were held by it as bailee) which ranged in value from 40 cents to $16 per gallon, including spirits, gin and rum, and whiskey of various distillations from 1917, and prior thereto, to the fall of 1933. The total tax thereon was $8,155,853.24 and the ratio of the tax to the value was from 12½% on the whiskey of 1917 and prior thereto, to 500% on spirits which was valued at 40 cents per gallon. The Finch Company had more than 1,500,000 gallons of the youngest whiskey at the market value of $2 per gallon."

Since the "floor tax" was imposed on its subjects regardless of value, the ratio of tax to value varied widely, this variation being from 12½% on whiskey valued at $16 a gallon to 500% on alcohol valued at forty cents a gallon.

As Judge HARGEST points out in his opinion: "At the time of the passage of the taxing act [November 22, 1933] no liquor could have been sold except that under the Federal law whiskey four years old could be sold for medicinal purposes and such a situation would have continued up to the time payment of the tax was required, if the [21st] amendment repealing prohibition [18th Amendment] had not been passed. [This repealing amendment became effective December 5, 1933.] At the time [November 29, 1933] the act was passed establishing the Liquor Control Board, and after, no liquor

could be legally sold in Pennsylvania except through that board. The legislature appropriated $2,000,000 which was required for the physical equipment and establishment of stores and the Board had no appropriation with which to stock the stores." The Commonwealth then, through the Liquor Board and with the approval of the governor, entered into practically identical agreements with these three companies by which the State agreed to purchase through its Alcohol Control Board 2,268,428 gallons from Overholt, 80,205 gallons from Large, and 4,220,441 gallons from Finch, deliveries to be made before the end of the year 1934, at the prices agreed upon. All these contracts provided that the companies were to pay to the Commonwealth at the time the liquor was purchased a tax upon the amount of gallons purchased, provided the Commonwealth performed its obligation under the agreement. The companies also reciprocally agreed (a) not to contest the constitutionality of the act; (b) to continue to pay the floor tax even though the act was declared unconstitutional as a result of a contest instituted by others; (c) not to seek refund of the tax paid pursuant to this arrangement. They also agreed to discontinue the actions pending in the Federal Court and to have that court vacate the restraining orders therein enjoining the enforcement of the tax. This contract the Commonwealth did not keep; it was unable to purchase the quantity therein provided for. Prior to February 28, 1935, which was the postponed date upon which it should have completed all purchases and payments, it had purchased less than 20% of the stipulated gallonage. On April 16, 1936, the Commonwealth definitely declared the agreement illegal and void and demanded the payment of the balance of the tax for which these suits were subsequently brought. Credits had been extended by these companies to the Liquor Control Board from time to time and the board was heavily indebted to these companies at the time the Commonwealth declared the contracts void.

The Commonwealth contends that the agreements were illegal and beyond the power of the State Liquor Control Board or any other officials of the State to make. The Commonwealth therefore demanded the balance of the tax due, together with interest at the rate of 12% per annum and the Attorney General's commission of 5%. The verdicts returned represent the full amounts claimed by the Commonwealth.

The contention of the defendants below, who are the appellees here, is that the law is unconstitutional for the reasons already herein stated, and that, even if the principal amount of the tax could be recovered, there is no right to recover interest and commission.

The provision of the Constitution of Pennsylvania invoked by the taxpayers is section 1 of Article IX, the applicable parts of which read as follows: "All taxes shall be uniform, upon the same class of subjects, within the territorial limits of the authority levying the tax, and it shall be levied and collected under general laws."

In *Cope's Estate,* 191 Pa. 1, 21, 43 A. 79, this court, after quoting this section, said: "The words, 'all taxes,' must necessarily be construed to include property tax, inheritance tax, succession tax and all other kinds of tax the subjects of which are susceptible of just and proper classification. By necessary implication, the first clause of that section recognizes the authority of the legislature to justly and fairly, but never arbitrarily, classify those subjects of taxation with the view of effecting relative equality of burdens. . . . These limitations on the power of the legislature mean something. They are plainly intended to secure, as far as possible, uniformity and relative equality of taxation, by prohibiting generally the exemption of a certain part of any recognized class of property, and subjecting the residue to a tax that should be borne uniformly by the entire class, and by guarding against any other device that necessarily or intentionally infringes on the established

rules of uniformity and relative equality which, as we have seen, underlie every just system of taxation."

In 26 R. C. L., page 37, sec. 21, it is stated: "Taxes are either specific or ad valorem. Specific taxes are of a fixed amount by the head or number, or by some standard of weight or measurement and require no assessment other than a listing or classification of the subjects to be taxed. An ad valorem tax is a tax of a fixed proportion of the value of the property with respect to which the tax is assessed, and requires the intervention of assessors or appraisers to estimate the value of such property before the amount due from each taxpayer can be determined. . . ."

In the court below the Commonwealth contended that the tax in question was a "specific tax," being "uniform" in its operation on the class, and that it need not have any ad valorem attributes. It conceived a specific tax to be one that imposed upon property by its "height, number, weight or other measurements," without reference to valuation. However, in his argument before our court, the Attorney General conceded that the challenged tax was a property tax. This concession, which the facts of the case clearly warranted, greatly simplifies the problem, for whether or not a certain *property* tax is so drafted or administered as to violate the constitutional requirement of uniformity is susceptible of almost mathematical demonstration.

In *D., L. & W. R. R. Co.'s Tax Assessment (No. 1)*, 224 Pa. 240, 73 A. 429, this court, after referring to the "demands made by the people upon legislative bodies for equality of taxation," said: "The large property owner and the small holder pay upon the same ratio, and when the valuation has been ascertained and fixed upon a fair basis, which means that the valuation should be based as nearly as practicable upon market value, and if not on market value, then upon the relative value of each property to market value, there results what is known in organic and statute law as uniformity, which is the

desideratum to be attained in any just system of taxation. While every tax is a burden, it is more cheerfully borne when the citizen feels that he is only required to bear his proportionate share of that burden measured by the value of his property to that of his neighbor. This is not an idle thought in the mind of the taxpayer, nor is it a mere speculative theory advocated by learned writers on the subject, but it is a fundamental principle written into the constitutions and statutes of almost every state in this country. In Pennsylvania the framers of the new constitution embodied this principle in our organic law in terms so plain that no one should misunderstand its meaning or doubt its application, and the people by the adoption of that instrument placed the seal of their approval upon a system of taxation which has for its corner stone uniformity in the valuation, levy and collection of all taxes. . . . There must be substantial uniformity which means as nearly uniform as practicable in view of the instrumentalities with which and subjects upon which tax laws operate."

Cooley in his Constitutional Limitations, 8th ed., Vol. 2, page 1040, lays down the following: "It is of the very essence of taxation that it be levied with equality and uniformity, and to this end, that there should be some system of apportionment. Where the burden is common, there should be common contribution to discharge it. Taxation is the equivalent for the protection which the government affords to the persons and property of its citizens; and as all are alike protected, so all alike should bear the burden, in proportion to the interests secured. Taxes by the poll are justly regarded as odious and are seldom resorted to for the collection of revenue; and when taxes are levied upon property there must be an apportionment with reference to a uniform standard, or they degenerate into mere arbitrary exactions." See also Cooley on Taxation, 4th ed., Vol. 1, sec. 267 at page 569, as to constitutional provisions for equality

and uniformity applying "to all kinds of property taxes."

Mr. Justice FIELD in his concurring opinion in *Pollock v. Farmers' Loan & Trust Co.*, 157 U. S. 586, 599, said: "The inherent and fundamental nature and character of a tax is that of a contribution to the support of the government, levied upon the principle of equal and uniform apportionment among the persons taxed. . . . This inherent limitation upon the taxing power forbids the imposition of taxes which are unequal in their operation upon similar kinds of property."

When property in the form of a gallon of liquor valued at forty cents is taxed $2, i. e., five times its value, while a gallon of liquor valued at $16 is taxed $2, i. e., ⅛th of its value, the uniformity clause of the State Constitution is violated precisely as it would be violated if in imposing taxes on two properties of exactly the same value, the legislature imposed on one a tax of forty cents and on the other a tax of sixteen dollars. If the owner of land worth $400 is taxed exactly the same as the owner of land worth $16,000, the former's constitutional right to uniformity of taxation is breached. Whether the thing taxed is a quantity of *liquor* or a quantity of *land* makes no difference; each is property. The burden of a property tax rests upon the property on which it is imposed and if the same tax is laid on two properties of unequal supporting economic power, the burdens are unequal. A two dollar tax on a unit of liquid property of the value of two dollars while the same tax is laid on the same unit of liquid property of the value of four dollars is just as much an offense against the constitutional prescription of uniformity as in the more extreme examples presented by this record. Uniformity of taxation means equality of tax burden. A tax to be uniform must operate alike on the classes of things or property subject to it. The tax herein challenged presents an outstanding example of a legislatively imposed inequality of burden, and to pro-

tect the citizen against it is a judicial duty. What this court said in *Fox's Appeal*, 112 Pa. 337, 4 A. 149, we now reiterate: "This portion of the Constitution [sec. 1, Art. IX] was intended to and does sweep away the power of the legislature to impose unequal burdens upon the people under the form of taxation."

We also agree with the court below that "The values of the liquors were deliberately and systematically disregarded. In the *Large* case the company is taxed every dollar the liquor is worth. In the *Finch* case, as to a very substantial part of it, the tax is much more than the liquor is worth and the Finch Company would be required to pay the excess of tax over value out of its general revenue, while in the *Overholt* case a large proportion of it is taxed exactly what it is worth." We hold, as did the court below, that this act imposing "a state floor tax upon spirituous and vinous liquors lodged or stored in this Commonwealth between the date this act becomes effective [November 22, 1933] and the date the twenty-first amendment to the Constitution of the United States is ratified by conventions in at least three-fourths of the several states [December 5, 1933], inclusive," is violative of the invoked respective provisions of the State and Federal Constitutions, for when a property tax lacking the constitutionally prescribed attribute of uniformity is imposed, the property owner is faced with an attempted trespass on his right of equality before the law—a right imbedded in the organic laws of both State and Nation. In *Cumberland Coal Co. v. Board of Revision of Tax Assessments, etc.*, 284 U. S. 23, the Supreme Court of the United States held that discrimination in State ad valorem taxation violates the equal protection clause of the Fourteenth Amendment. In *Colgate v. Harvey, State Tax Commissioner*, 296 U. S. 404, 422, the same court while recognizing that "absolute equality of taxation cannot be obtained and is not required under the Fourteenth Amendment," said: "This, of course, is not to say that, because some

degree of inequality from the nature of things must be permitted, gross inequality must also be allowed"; and in *Railway Co. v. Philadelphia*, 101 U. S. 528, 537, it declared: ". . . the rule of equality ought always to prevail in imposing public burdens."

We also hold that the severability clause of the Floor Tax Statute cannot save it. After excising the parts of this statute which trench upon the Constitution, nothing remains that can effectively function.

The judgments are affirmed.